Lawrence P. Eagel
Jeffrey H. Squire
Justin A. Kuehn
BRAGAR EAGEL & SQUIRE, P.C.
885 Third Avenue, Suite 3040
New York, New York 10022
Tel: (212) 308-5858
Fax: (212) 486-0462
eagel@bespc.com
squire@besp.com
kuehn@bespc.com

*Attorneys for Plaintiff and the Classes*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STEVEN BROWN, on behalf of himself and all others similarly situated,<br><br>          Plaintiff,<br><br>    v.<br><br>DRAFTKINGS, INC.,<br><br>          Defendant. | Case No.  15-cv-08165<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Steven Brown ("Mr. Brown" or "Plaintiff"), by his undersigned counsel, on behalf of himself and all others similarly situated, complaining of defendant DraftKings, Inc. ("DraftKings" or "Defendant"), alleges upon information and belief, as follows:

**Preliminary Statement**

1.      This is a class action against Defendant DraftKings for fraudulent omission, unjust enrichment, violations of New York General Business Law ("GBL") § 349, and providing notice of violations of MASS. GEN. LAWS ch. 93A arising out of Defendant's employees'

exploitation of their access to nonpublic data to gain an unfair financial advantage in daily fantasy sports competitions ("DFS") taking place on the website of FanDuel, Inc. ("FanDuel").

2.      DFS is considered to be – and is marketed as – a game of skill and therefore is not regulated as gambling.  In DFS, participants buy into competitions and make (or lose) money based upon the real world performance of their chosen athletic lineup for the given day relative to the lineups selected by other DFS participants.  The DFS companies, such as Defendant, make money by retaining a portion of the entry fees paid by each participant to partake in the competitions.

3.      Defendant is one of the dominant companies in the DFS industry.  On or around September 27, 2015, it was revealed that DraftKings employees had access to material nonpublic player ownership statistics, and were using this material nonpublic information with striking success in DFS contests on the website of their chief competitor FanDuel to profit at the expense of FanDuel's DFS participants.

4.      Since the truth was revealed about Defendant's employees' use of nonpublic data, the New York Attorney General opened an investigation, stating in a letter to DraftKings, dated October 6, 2015, "[t]hese allegations, and your company's subsequent statement, raise legal questions relating to the fairness, transparency, and security of DraftKings and the reliability of representations your company has made to customers."

## Jurisdiction and Venue

5.      This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d) because the aggregate amount in controversy exceeds $5,000,000.00 and there is diversity between a plaintiff and a defendant.

6.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) because Defendant is a resident of this judicial district under 28 U.S.C. § 1391(c).  Venue is also proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred within this judicial district.

**Parties**

7.      Plaintiff Steven Brown resides in New York, New York.  Between December 27, 2014, and September 27, 2015, Mr. Brown deposited and risked at least $150.00 on FanDuel.  Had Plaintiff known that Defendant permitted its employees to exploit nonpublic information to profit at DFS at the expense of FanDuel participants, he would not have played DFS on FanDuel.

8.      Defendant DraftKings is a Delaware Corporation with its principal place of business in Boston, Massachusetts.

**Background**

9.      In a DFS contest, participants typically select a lineup of players within the confines of a "salary cap."  Points are awarded based upon the statistics compiled by the chosen players in real life.  The lineups with the most points win the most money.  Because DFS participants compete directly against each other, the ability to build lineups with high expected value by playing low ownership high upside players is a great advantage.

10.     Defendant held DFS out as a competition with a level playing field where skill made the difference between profiting and losing money.  For example:

- In a television commercial that ran in August 2015 (available at https://www.youtube.com/watch?v=VDa-cDu8KYg), DraftKings advertised "every week, use your knowledge and showcase your skills….you like football, you like winning."

- In a television commercial that ran in August 2015 (available at https://www.youtube.com/watch?v=bfCm6PJuL5I), DraftKings advertised its website as "a game within the game, that requires a different set of skills…we don't just play, we are players, we train, and we win."

11. However, due to Defendant's conduct, DFS were not the fair contests of skill Defendant held them out to be, but rather were corrupted by DraftKings insiders' use of nonpublic information.

**DraftKings' Employees Exploit Inside Information to
Profit at the Expense of the Class**

12. A DFS participant's skill rests on his/her ability to analyze data and information. Employees of DraftKings have access to real-time data on current lineups of every DFS participant on Defendant's site and the overall ownership percentages of every player. This ownership data is not publicly available, but is immensely valuable because, due to the nature of DFS, it is difficult to be successful with commonly owned players.

13. During the relevant time period, DraftKings' employees were not permitted to play DFS on Defendant's own website, but were permitted to play DFS on FanDuel. Thus, Defendant knowingly permitted its employees to use the nonpublic ownership information they were able to access in the course of their employment to gain an edge in similar contests on FanDuel. Since ownership percentages between DraftKings and FanDuel are similar, having information from one DFS site entails a substantial benefit to someone participating on the competing site.

14. On or around September 27, 2015, a DraftKings employee, Ethan Haskell, posted player ownership percentages for DraftKings' "Week 3 Millionaire Maker" NFL contest online before such percentages were supposed to be publicly available. Mr. Haskell claimed that his

4

post was "published in error," that he "was the only person with this data," and noted that, "as a [DraftKings] employee he is not allowed to play on site."  However, the same week that Mr. Haskell posted the ownership data for the DraftKings "Millionaire Maker," he beat nearly 230,000 DFS participants in the equivalent FanDuel contest the "$5M NFL Sunday Million" to come in second and win $350,000.  Below is a chart from larrybrownsports.com[1] showing the stark similarity between the ownership percentages for the players in the lineup Mr. Haskell entered in the FanDuel "$5M NFL Sunday Million" and the ownership percentages for the same players in the DraftKings "Millionaire Maker" contest for the same period:

| Player | FanDuel % | DraftKings % |
|---|---|---|
| Andy Dalton | 2.3 | 2.5 |
| Adrian Peterson | 18.6 | 22.4 |
| Devonta Freeman | 6.7 | 8 |
| Randall Cobb | 8.2 | 12.3 |
| A.J. Green | 4.4 | 6 |
| Allen Hurns | 2 | 2.1 |
| Greg Olsen | 10.5 | 8.3 |
| Stephen Gostkowski | 10.8 | N/A |
| Seattle D | 22.6 | 30.7 |

15.    Despite the similarity of the ownership percentages as outlined above, DraftKings claimed that Mr. Haskell's success in the FanDuel "$5M NFL Sunday Million" was a coincidence.

---

[1] See http://larrybrownsports.com/fantasy/ethan-haskell-draft-kings-fanduel-profile/276741.

5

16.     Further review of Mr. Haskell's DFS history shows he has experienced extraordinary success entering DFS contests on FanDuel since becoming a DraftKings employee. For example in August 2015 alone, Mr. Haskell had three first places finishes, eight top 10 finishes, and 20 finishes with a significant cash payout in Major League Baseball DFS on FanDuel.

17.     It is currently estimated that DraftKings' employees have won a total of $6 million entering DFS contests on FanDuel.

18.     DraftKings was well aware that its employees were playing DFS on FanDuel. DraftKings co-founder Paul Liberman has admitted that some of the company's employees made more money from playing DFS on other websites than from their salaries at DraftKings.[2]

19.     Had Plaintiff and members of the proposed Class known that DraftKings was allowing its employees to play against them, Plaintiff and members of the proposed Class would not have played DFS on FanDuel.

20.     Plaintiff deposited money on FanDuel before the disclosure of the fact that DraftKings employees were playing with inside information.

21.     Ultimately, DraftKings, at least for the time being, changed its internal rules to prevent its employees from playing on other DFS sites.

**Class Action Allegations**

22.     Plaintiff brings this lawsuit as a class action on behalf of himself and all others similarly situated as members of the proposed Class pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) and/or (b)(2).  This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

---

[2] See http://espn.go.com/chalk/story/_/id/13840184/class-action-lawsuit-accuses-draftkings-fanduel-negligence-fraud-false-advertising.

23.     The proposed nationwide class Plaintiff seeks to represent is defined as follows:

All persons in the Unites States who, on or before October 5, 2015, deposited money into a FanDuel account and competed in any DFS contest on FanDuel where entries were made by employees of DraftKings (the "Nationwide Class").

24.     Plaintiff also brings this action on behalf of a statewide class, defined as follows:

All persons in the State of New York who, on or before October 5, 2015, deposited money into a FanDuel account and competed in any DFS contest on FanDuel where entries were made by employees of DraftKings (the "New York Subclass").

25.     Excluded from the Classes are: (1) Defendant, any entity or division in which Defendant has a controlling interest, and its legal representatives, officers, directors, assignees, and successors; (2) the Judge to whom this case is assigned and the Judge's staff; and (3) governmental entities.  Plaintiff reserves the right to amend the Class definitions if discovery and further investigation reveal that the Class should be expanded, otherwise divided into subclasses, or modified in any other way.

**Numerosity & Ascertainability**

26.     Although the exact number of Class members is uncertain and can only be ascertained through appropriate discovery, the number is great enough such that joinder is impracticable.  The disposition of the claims of these Class members in a single action will provide substantial benefits to all parties and to the Court.  Class members are readily identifiable from information and records in Defendant's possession, custody, or control.

**Typicality**

27.     Plaintiff's claims are typical of the claims of Class members, as Plaintiff and the other members of the Class sustained damages arising out of the same wrongful conduct by Defendant, as alleged herein.

**Adequate Representation**

28.     Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff has retained counsel with substantial experience in prosecuting consumer class actions.

29.     Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the Class, and have the financial resources to do so.  Neither Plaintiff nor his counsel have interests adverse to those of the Class.

**Predominance of Common Issues**

30.     There are numerous questions of law and fact common to Plaintiff and Class members that predominate over any question affecting only individual Class members, the answer to which will advance resolution of the litigation as to all Class members.  These common legal and factual issues include:

      a.   whether Defendant violated state consumer protection statutes, including, *inter alia*, GBL § 349 and MASS. GEN. LAWS ch. 93A, and if so, what remedies are available by law;

      b.   whether the Court should enjoin Defendant from continuing to engage in the conduct complained of herein;

      c.   whether Defendant's employees used nonpublic data and/or information to gain an advantage in FanDuel DFS competitions;

      d.   whether Defendant unjustly enriched itself by its acts and omissions, at the expense of Plaintiff and members of the Class;

      e.   whether Plaintiff and Class members are entitled to equitable relief, including, but not limited to, a preliminary and/or permanent injunction; and

      f.   the extent of the damages caused by Defendant's acts.

**Superiority**

31.     Plaintiff and Class members have all suffered and will continue to suffer harm and damages as a result of Defendant's unlawful and wrongful conduct.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

32.     Absent a class action, most Class members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law.  Because of the relatively small size of the individual Class members' claims, it is likely that only a few Class members could afford to seek legal redress for Defendant's misconduct.  Absent a class action, Class members will continue to incur damages, and Defendant's misconduct will continue without remedy.

33.     Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the courts and the litigants, and will promote consistency and efficiency of adjudication.

## <u>MASS. GEN. LAWS CH. 93A NOTICE</u>

34.     Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

35.     Plaintiff provides this notice on behalf of himself and the Nationwide Class.

36.     Plaintiff hereby provides Defendant with notice and demands that within thirty days, Defendant corrects, repairs, replaces or otherwise rectifies the unlawful, unfair, false and/or deceptive practices complained of herein.  Defendant's failure to do so will result in Plaintiff amending this Complaint to seek, pursuant to MASS. GEN. LAWS ch. 93A, § 9, on behalf of

himself and those similarly situated Class members, compensatory damages, treble damages, reasonable attorneys' fees, and such equitable relief as the Court deems just and proper.

## FIRST CLAIM FOR RELIEF

### (Fraudulent Omission on behalf of Plaintiff and the Nationwide Class against Defendant)

37.     Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

38.     Defendant knew that its employees were exploiting their access to nonpublic data to gain an unfair financial advantage in DFS at the expense of FanDuel contestants and thus FanDuel's DFS contests were not fair contests with a level playing field where entrants' success or failure was to be determined by their level of skill.

39.     Defendant concealed from and failed to disclose to Plaintiff and the Class the unfair nature of FanDuel's DFS contests that was due to Defendant's activities.

40.     Defendant was under a duty to Plaintiff and the Class to disclose the true nature of their DFS contests because:

a.  Defendant was in a superior position to know the true state of facts about the fairness of FanDuel's DFS contests; and

b.  Defendant actively concealed from Plaintiff and the Class the unfair nature of FanDuel's DFS contests resulting from its employees' exploitation of their access to nonpublic data to gain an unfair financial advantage.

41.     The facts concealed or not disclosed by Defendant to Plaintiff and the other Class members are material in that a reasonable person would have considered them to be important in deciding whether to deposit money and ultimately enter DFS contests.  Had Plaintiff and the

Class members known that DraftKings insiders were exploiting nonpublic information at the expense of FanDuel DFS participants, they would not have entered DFS contests on FanDuel.

42.     Defendant concealed or failed to disclose the unfair nature of FanDuel's DFS contests resulting from its employees' exploitation of their access to nonpublic data to gain an unfair financial advantage in order to induce Plaintiff and the Class members to act thereon. Plaintiff and the other Class members justifiably relied on the omission to their detriment. This detriment is evident from Plaintiff's and the Class members' depositing money and playing DFS contests on FanDuel.

43.     As a direct and proximate result of Defendant's misconduct, Plaintiff and the Class have suffered and will continue to suffer actual damages.

## SECOND CLAIM FOR RELIEF

### (Unjust Enrichment on behalf of Plaintiff and the Nationwide Class against Defendant)

44.     Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

45.     Defendant has received and retained a benefit from Plaintiff and the Class, resulting in inequity.

46.     Defendant has benefitted from inducing Plaintiff and members of the Class to play DFS on FanDuel by claiming that DFS contests are fair contests with a level playing field where entrants' success or failure would be determined by their level of skill, when in fact Defendant permitted its employees to exploit their access to nonpublic data to gain an unfair financial advantage in DFS at the expense of FanDuel contestants. *Ceteris paribus,* the skills of Plaintiff and the proposed Class would have seen them achieve greater financial success

playing on the DFS sites were it not for the interference of Defendant's employees and their use of inside information.

47.     Thus, all Class members have conferred a benefit on Defendant, which it is inequitable for Defendant to retain.

48.     Plaintiff was not aware of the true facts and did not benefit from Defendant's conduct.

49.     Defendant knowingly accepted the benefits of its unjust conduct.

50.     As a result of Defendant's conduct, the amount of its unjust enrichment should be disgorged, in an amount to be determined at trial.

## THIRD CLAIM FOR RELIEF

### (Violation of GBL § 349 on behalf of Plaintiff and the New York Subclass against Defendant)

51.     Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

52.     Plaintiff and the other members of the New York Subclass have been injured and suffered damages by violations of section 349(a) of the "GBL", which states:

> Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful.

53.     Defendant engaged in acts and practices in the State of New York that were deceptive or misleading in a material way, and that injured Plaintiff and the other members of the New York Subclass.  Such acts and practices were likely to mislead a reasonable consumer acting reasonably under the circumstances existing at the time.

54.     Defendant's deceptive acts include omitting that it permitted its employees to exploit their access to nonpublic data to gain an unfair financial advantage in DFS at the expense

of FanDuel contestants, and instead openly representing that DFS contests were fair contests with a level playing field where entrants' success or failure would be determined by their level of skill.

55.     Plaintiff and the other members of the New York Subclass have been damaged by Defendant's violations of section 349 of the GBL, for which they seek recovery of the actual damages they suffered due to Defendant's willful and wrongful violations of section 349, in an amount to be determined at trial.

56.     Plaintiff and the other members of the New York Subclass also seek to enjoin Defendant's practices that violate section 349 of the GBL.

57.     Plaintiff and the other members of the New York Subclass seek treble damages and an award of reasonable attorney's fees pursuant to section 349(h) of the GBL.

## PRAYER FOR RELIEF

WHEREFORE Plaintiff prays for judgment as follows:

A.      For an order certifying the proposed Classes, and appointing Plaintiff and his counsel to represent the Classes;

B.      For an order awarding Plaintiff and the members of the Classes statutory, punitive, or any other form of damages provided by and pursuant to the statutes cited above;

C.      For an order awarding Plaintiff and the members of the Classes restitution, disgorgement or other equitable relief provided by and pursuant to the statutes cited above or as the Court deems proper;

D.      For an order enjoining Defendant from continuing the wrongful acts and practices alleged;

13

E.      For an order awarding Plaintiff and the members of the Classes pre-judgment and post-judgment interest;

F.      For an order awarding Plaintiff and the members of the Classes reasonable attorneys' fees and costs of suit, including expert witness fees; and

G.      For an order awarding such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands trial by jury.

Dated: October 16, 2015

BRAGAR EAGEL & SQUIRE, P.C.

By:  _s/Justin Kuehn_____
    Lawrence P. Eagel
    Jeffrey H. Squire
    Justin A. Kuehn
885 Third Avenue, Suite 3040
New York, New York 10022
Tel: (212) 308-5858
Fax: (212) 486-0462
eagel@bespc.com
squire@bespc.com
kuehn@bespc.com

*Attorneys for Plaintiff and the Classes*